# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM DAVIS, individually and on behalf of those similarly situated,<br><br>              Plaintiff,<br>    v.<br><br>PEPSICO, INC. and WALMART INC.,<br><br>              Defendants. | **Case No.**<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff William Davis ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action against PepsiCo, Inc. ("Pepsi") and Walmart Inc. ("Walmart") (collectively, Defendants), pursuant to Federal Rule of Civil Procedure 23, for violating the federal antitrust laws. Plaintiff's claims stem from agreements between Pepsi, the second-largest beverage and processed food company in the world, and Walmart, one of the largest retailers in the world, to inflate prices for Pepsi soft drinks and other beverages above competitive levels.

## I.    NATURE OF THE CASE

1.    Pepsi is one of the largest soft drink companies in the world. Pepsi's soft drinks and other beverages include well-known brands like Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks (together, "Pepsi Beverages").

2.    Walmart is Pepsi's most important customer. In its 2024 Annual Report, Pepsi advised that sales to Walmart and its corporate affiliates were responsible for 14% of Pepsi's consolidated net revenue, or approximately $12.86 billion. Accordingly, Pepsi told investors that losing Walmart as a customer "would have a material adverse effect" on all of Pepsi's business. Walmart was the *only* such customer identified in Pepsi's 2024 Annual Report.

3.    Beginning as early as 2018, Pepsi and Walmart entered into a scheme (the "Scheme") to prevent wholesale and retail competition for Pepsi Beverages, thereby ensuring that both companies can charge supracompetitive prices.  This scheme was described in detail in a complaint for permanent injunction filed by the U.S. Federal Trade Commission ("FTC") against PepsiCo in this district last year.

4.    Defendants' Scheme has two components. First, Pepsi agreed to inflate its wholesale prices above competitive levels for Pepsi Beverages to its wholesale customers other than Walmart. Pepsi's wholesale customers purchase Pepsi Beverages directly from Pepsi or Walmart

and compete with Walmart in selling those products at retail. The resulting wholesale price inflation enabled Walmart to elevate its retail prices for Pepsi Beverages above competitive levels and forced Walmart's competitors to charge higher prices at retail than they otherwise would have.

5.    Second, Pepsi required its wholesale customers to charge retail prices that were higher than Walmart's price for Pepsi Beverages—even if Walmart's retail prices were well above Pepsi's wholesale prices. In furtherance of this second part of the Scheme, Pepsi monitored and policed its wholesale customers' retail prices, and punished those that undercut Walmart with further wholesale price increases.

6.    In exchange for Pepsi's actions to raise retail prices, Walmart agreed to accept Pepsi's elevated wholesale prices. Thus, the agreement allowed Pepsi to impose numerous wholesale price increases on Pepsi Beverages. These price increases cannot be explained by market conditions, such as supply, demand, or costs.

7.    The Scheme reduced price competition at the wholesale level and disadvantaged Pepsi direct purchasers other than Walmart, including grocery stores, local convenience stores, mid-tier grocers, and independent retailers. The Scheme has forced these buyers, including Plaintiff, to pay inflated prices to Pepsi for Pepsi Beverages.

8.    The Scheme benefited both Pepsi and Walmart. It allowed Pepsi to reap supracompetitive profits from its sales of Pepsi Beverages to wholesale purchasers. Walmart benefited because it was able to sell Pepsi Beverages at inflated prices without being undercut by other sellers.

9.    The Scheme was facilitated by Pepsi's power in the market for soft drinks and its oligopolistic power with the Coca-Cola Company ("Coca-Cola"), and Keurig Dr. Pepper Inc. ("Dr. Pepper"). Together, these three companies sell *over 90 percent* of carbonated soft drinks sold in

the United States. In an oligopolistic market like this, a price increase by one dominant market actor—here, Pepsi—will often be met by comparable price increases by the other dominant market actors—particularly if a dominant retailer—Walmart—limits their ability to gain market share by competing on price.

10.    The Scheme thus reduced interbrand competition at the wholesale level, both by preventing Walmart from lowering its retail prices and demanding lower wholesale prices as a result, and by reducing competition between Pepsi and its primary rivals. This increased Pepsi's market power and further increased the prices it charged its direct customers, including Plaintiff.

11.    On information and belief, the Scheme arose and was facilitated, in part, due to the close connections between Walmart and Pepsi. Pepsi's current CFO, Steven Schmitt, joined Pepsi in late 2025 after spending more than ten years at Walmart.[1] Pepsi's Chief People Officer, Becky Schmitt,  "served in various executive human resources roles at Walmart, Inc., including as senior vice president, chief people officer of Sam's Club, a division of Walmart, from 2018 to 2020, senior vice president, chief people officer of U.S. eCommerce and corporate functions from late 2016 to 2018, and vice president, human resources – technology from early 2016 to late 2016." Pepsi's CEO, North America, Steven Williams, "served as General Manager and Senior Vice President, Customer Management for PepsiCo's global Walmart business from 2013 to 2016." Pepsi has admitted that it has taken measures against smaller purchasers to impair their ability to compete with Walmart on price, as in its 2023 Annual Report: "The increasing power of retailers and consolidation also adversely impacts our smaller customers' ability to compete effectively, resulting in an inability on their part to pay for our products or reduced or canceled orders of our products. Further, we must maintain mutually beneficial relationships with our key customers,

---

[1] https://www.pepsico.com/leadership/steven-schmitt

including Walmart, to compete effectively."

12.    The percentage of Pepsi products sold through Walmart also reflects an agreement.

Starting in 2022, Pepsi has sold 14% of its products through Walmart. This is significantly more

than the historic trend, which averaged about 12% from 2007 until 2014:

| 2024 | 14% |
|------|-----|
| 2023 | 14% |
| 2022 | 14% |
| 2021 | 13% |
| 2020 | 14% |
| 2019 | 13% |
| 2018 | 13% |
| 2017 | 13% |
| 2016 | 13% |
| 2015 | 13% |
| 2014 | 12% |
| 2013 | 11% |
| 2012 | 11% |
| 2011 | 11% |
| 2010 | 12% |
| 2009 | 13% |
| 2008 | 12% |
| 2007 | 12% |

13.    Walmart has engaged in a Scheme like this one before. Around the same time Walmart required Pepsi to agree to protect Walmart from retail competition by raising its rivals' wholesale prices for Pepsi Beverages, Walmart secured a nearly identical agreement from Energizer Holdings, Inc., in another highly concentrated market, disposable batteries.[2] There, as here, Energizer agreed to raise wholesale prices on customers selling below Walmart's retail prices to protect Walmart from competition.

14.    There, as here, the defendants' conduct made little sense absent an agreement. As the District Court observed in denying Walmart and Energizer's motion to dismiss the direct purchaser complaint challenging Walmart's scheme with Energizer: "If Energizer was independently pursuing its own interests, then for any given wholesale price, Energizer would generally be motivated to *minimize* the ultimate retail prices—thereby maximizing sales and ultimately its profits."[3] The same is true for Pepsi. The fact that Pepsi sacrificed its own sales by *raising* retail prices reflects "that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create."[4]

15.    The Scheme caused direct purchasers of Pepsi Beverages from Pepsi or Walmart, like Plaintiff, to pay higher prices than they otherwise would have.

16.    Plaintiff brings suit on behalf of himself, and on behalf of a national class of direct purchasers, to recover treble the overcharges they paid and to enjoin Defendants' unlawful conduct.

---

[2] *See* Complaint, *Portable Power, Inc. v. Energizer Holdings, Inc.*, No. 5:23-cv-02087 (N.D. Cal. Apr. 28, 2023), ECF No. 1.
[3] *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024) (emphasis added).
[4] *Id.*

## II.    THE PARTIES

17.    Plaintiff William Davis ("Davis") is a California resident who has purchased and continues to purchase Pepsi Beverages from Walmart. He has purchased Pepsi beverages from Walmart since at least June 2022. Davis purchased Pepsi Beverages at artificially inflated prices directly from Walmart during the Class Period defined below. Davis suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

18.    Defendant Pepsi is an American multinational snack, food, and beverage manufacturer incorporated in North Carolina and headquartered in Purchase, New York. Pepsi conducts its business throughout the United States and across state lines, with dozens of production and distribution locations across the country. Founded in 1898, Pepsi owns or controls multiple iconic beverage and food brands worth over $1 billion, including Pepsi-Cola, Frito Lay, Mountain Dew, Starbucks (under license), Gatorade, and Aquafina. In 2023, Pepsi reported global net revenues of over $91 billion.

19.    Defendant Walmart is the largest company in the world by revenue and operates thousands of retail stores in the United States. Walmart is incorporated in Delaware and maintains its headquarters in Bentonville, Arkansas.

## III.    JURISDICTION AND VENUE

20.    This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26). Plaintiff seeks treble damages for his injuries, and those suffered by members of the proposed Class, resulting from Defendants' anticompetitive conduct; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States.

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question) and § 1337(a) (antitrust), as well as 15 U.S.C. § 15 (antitrust). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from that of each Defendant.

22.     This Court has personal jurisdiction over all of the Defendants because each of them transacted business in this District and engaged in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

23.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because Pepsi has sold Pepsi Beverages to Walmart and members of the proposed Class in this District, and certain unlawful acts by the Defendants were performed in this District as described above, and those and other unlawful acts caused harm to interstate commerce in this District.

## IV.    FACTUAL BACKGROUND

### A.    The Soft Drink Market

24.     The manufacture and sale of soft drinks (i.e., non-alcoholic beverages) in the United States is a $150 billion industry. Soft drinks include carbonated drinks, non-carbonated drinks, bottled water, energy drinks, and juices.

25.     The soft drink market in the United States is dominated by three companies: Pepsi, Coca-Cola, and Dr. Pepper. Together, these companies sell more than 90% of carbonated soft drinks in the United States.

26.     Pepsi is a major player in the U.S. soft drink market with significant market power

in the market for bottled soft drinks. According to its 2024 Annual Report, Pepsi controls approximately 18% of the U.S. liquid refreshment beverage category. Its rival, The Coca-Cola Company controls approximately 21% of the market.

27.     Pepsi is organized into seven divisions, including PepsiCo Beverages North American ("PBNA"). PBNA operates Pepsi's soft drink division in North America, generating over $27 billion in revenue in 2023.

28.     Pepsi makes, markets, and sells a wide variety of Pepsi Beverages, including soft drinks and sodas, water, tea, coffee, and energy drinks, under the brand names Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks, among others.

29.     Pepsi operates its own bottling plants and distribution facilities and sells branded finished goods directly to independent distributors and retailers.

30.     Pepsi sells to customers across multiple retail channels, including big box stores, grocery stores, pharmacies, convenience stores, and discount stores. Pepsi sets the prices at which it sells Pepsi Beverages directly to distributors and retailers.

31.     The soft drink market is characterized by high barriers to entry including brand loyalty, advertising costs, entrenched distribution networks, economies of scale for incumbents, and limited retail space.

32.     Distribution networks, developed and refined over decades, also constitute a high barrier to entry. Pepsi's complex nationwide network of manufacturing, bottling and distribution operations allow Pepsi and other large sellers, like Coca-Cola, to leverage economies of scale and ability to serve a wide customer base. These entrenched networks create a significant barrier to entry for potential competitors.

33.    Advertising costs in the soft drink industry are notable. In 2024, Pepsi spent $5.9 billion on advertising and other marketing activities.

34.    Pepsi's investment in advertising has yielded broad brand recognition. As a result, many food and beverage retailers consider it important to offer Pepsi Beverages. Failing to carry Pepsi Beverages can put them at a competitive disadvantage to retailers that do carry Pepsi products.

**B.    The Pepsi-Walmart Scheme**

35.    The U.S. Securities and Exchange Commission requires publicly traded companies, like Pepsi, to disclose if sales to a single customer exceed 10% of total revenue, such that losing that customer would cause a material adverse effect. In its last several Annual Reports, Pepsi has identified only one such customer: Walmart.

36.    Walmart is one of the largest food and beverage retailers in the United States. It uses its buyer power to negotiate national supply agreements directly with soft drink manufacturers, including Pepsi.

37.    As early as January 2018, Pepsi and Walmart agreed to the Scheme.

38.    The Scheme has two components. First, Pepsi agreed with Walmart to artificially inflate the wholesale prices it charged to Walmart's competitors for Pepsi Beverages. Second, Pepsi agreed to monitor Walmart's competitors to ensure that they did not charge lower retail prices for Pepsi Beverages than Walmart and to discipline those that did, including by raising their wholesale prices.

39.    To ensure that other retailers charge higher prices than Walmart for Pepsi Beverages, Pepsi works with Walmart to create what Defendants refer to as a retail "price gap." This gives Walmart an advantage over its brick-and-mortar competitors in the resale of Pepsi

Beverages to consumers.

40.    According to an investigation conducted by the U.S. Federal Trade Commission and laid out in its complaint against Pepsi last year,[5] Pepsi's internal business documents reflect a "foundational commitment" to provide Walmart with this price gap: "Delivering on Walmart hedge commitments is an aligned commercial strategy" across Pepsi. The FTC cited one internal Pepsi email explaining, "stay[ing] focused on our price gap . . . is how we win with Walmart—[w]e stay focused on our deliverables and commitments."

41.    The FTC further learned that Pepsi keeps close track of Walmart's "price leadership" through regular retail price monitoring. In particular, Pepsi tracks two metrics related to the Walmart retail price gap arrangement: (1) price gap and (2) value hedge. Price gap is the "[c]omparison of average price at Walmart [versus] comparisons within a time frame weighted on Walmart volume for items." By contrast, the "value hedge" metric does not weight by Walmart's volume of items, and instead represents a percentage difference in average retail price between Walmart and other retailers. Each metric compares retail prices for Pepsi beverages at Walmart with retail prices for the "rest of market" or "ROM." "[R]est of market" includes "multi outlet" or "multi-channel" stores, and stores in the grocery, club, drug, and dollar channels, but excludes Walmart.

42.    Walmart also monitors its "price gap" on Pepsi Beverages. Pepsi and Walmart regularly communicate about whether Pepsi is meeting Walmart's price gap expectations on a short- and long-term basis. Internal documents indicate that Pepsi endeavors to "manage [retail] price gap expectations to longer timeframes," namely, annual and semi-annual timeframes, but it also views monthly and quarterly retail price gaps as "leading indicators" of potential issues with

---

[5] Complaint for Permanent Injunction, *Federal Trade Commission v. PepsiCo, Inc.*, No. 25-cv-00664-JMF, Dkt. No. 68 (S.D.N.Y. Dec. 11, 2025).

Walmart. Walmart's buyers (employees responsible for negotiating purchases from manufacturers such as Pepsi) would receive "Price Gap" reports before planned meetings with Pepsi executives and would discuss how to address specific gaps.

43.    This continual monitoring of Walmart's retail price gap on Pepsi Beverages as compared with the rest of the market and sharing of information allowed Walmart to police Pepsi's compliance with the Scheme.

44.    When Walmart's price gap narrowed due to competitive prices from other retailers, Pepsi executives feared Walmart's negative reaction. For example, according to the FTC, in 2019, Pepsi executives became aware of aggressive price cutting by another retailer relating to 12 packs of Pepsi soft drinks. The Pepsi executives became concerned that the price cutting would threaten Walmart's retail price gap. The FTC identified a document in which a Pepsi executive expressed concern about Walmart's reaction to a price gap report: "They have now had multiple weeks of very aggressive pricing and [Walmart senior buyer] will receive a Price Gap report just prior to when [Pepsi executive] is visiting with him about how we move forward on 12pk [twelve-pack cartons of Pepsi soft drinks]."

45.    Per the FTC, to achieve and sustain the Walmart price gap, advantage Walmart in the resale of Pepsi Beverages, and adhere to the agreed-upon Scheme, Pepsi disadvantaged other direct purchasers of Pepsi Beverages by selectively reducing promotional payments and allowances and raising wholesale prices.

46.    When Pepsi or Walmart learn that other retailers are threatening Walmart's agreed upon retail price gap under the Scheme, these retailers are labeled "offenders." Pepsi takes action to punish the "offenders' by eliminating promotional support and increasing wholesale prices. Pepsi takes these actions against discounting retailers with the expectation that, to meet margin

goals, those retailers will pass on the wholesale price increase to consumers by raising retail prices on Pepsi Beverages, thereby restoring Walmart's price gap. In other words, to enforce Walmart's price gap, Pepsi seeks to drive up retail prices for Pepsi Beverages sold by Walmart's rivals.

47.    The FTC identified an internal Pepsi email from 2019 that acknowledges an effort to advantage Walmart in the resale of Pepsi Beverages by increasing competitors' costs to buy Pepsi Beverages: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs / retails in order to drive growth on our mutual businesses." Pepsi describes a cost increase it imposed on other retailers, but not Walmart: "[REDACTED]cost increase in the rest of market. The cost increase, which is already in effect in rest of market, has not been passed on to Walmart."

48.    An example of Pepsi strategizing to raise prices of another retailer to facilitate the Scheme and protect Walmart's price gap involves the supermarket retailer Food Lion. Food Lion is a regional supermarket chain that operates over 1,000 stores across 10 states. According to the FTC, in 2022, Pepsi believed that Food Lion was the "worst offender" on the price gap for "beating [Walmart] in price."

49.    As a result of Food Lion threatening Walmart's price gap, Pepsi created a plan to force Food Lion to increase retail prices on Pepsi Beverages by raising Food Lion's costs to acquire Pepsi Beverages, including by reducing promotional payments and allowances to Food Lion. The plan advised that Pepsi "must commit to raising rate [on Food Lion] faster than market by minimum [REDACTED] annually." Pepsi's plan included a multi-year initiative that recommended a combination of (1) reductions in promotional payments and allowances and (2) wholesale price hikes to raise Food Lion's dead net price, or price including all discounts, allowances, and other charges. Pepsi was clear about its purpose in targeting Food Lion. Pepsi was

raising Food Lion's costs buy Pepsi Beverages to "begin to CLOSE the gap" because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term."

50.    These acts are contrary to Pepsi's independent self-interest. Indeed, if Pepsi was independently pursuing its own economic interests, it would be motivated to minimize retail prices, including at Food Lion, which would drive sales volume and profit.  Likewise, in a competitive market, if Walmart was concerned about discounted Pepsi Beverages at Food Lion or any other retailer, it would have demanded lower prices from Pepsi to subsidize its own lower retail prices.

51.    Walmart's Scheme to monitor and inflate competing retail prices with Pepsi was business as usual for Walmart. Walmart – the world's largest retailer – uses its power to require suppliers, such as Pepsi, to monitor, enforce and inflate the retail prices of competing products. Indeed, Walmart has been alleged to have entered into a similar scheme with another supplier in another oligopolistic market in or about the same time of its Scheme with Pepsi. Energizer, one of two major sellers of batteries in the United States, is alleged to have made a similar agreement whereby Walmart received preferential pricing to the detriment of all other wholesaler buyers from Energizer. Energizer reaped supracompetitive profits from the inflated prices paid by wholesale buyers while Walmart could charge inflated retail prices without fear of being undercut by other retailers. *Copeland, et al. v. Energizer Holdings, Inc.*, 716 F. Supp. 749 (N.D. Cal. 2024).

52.    The district court in *Copeland* denied defendants' motion to dismiss. It found that "Energizer's actions are more suggestive of an agreement than rational independent business behavior." *Copeland*, 716 F. Supp. 3d at 764. The court explained, "If Energizer was independently pursuing its own interests, then for any given wholesale price, Energizer would generally be motivated to minimize the ultimate retail prices—thereby maximizing sales and

ultimately its profits. Even if Energizer decided it wanted to raise wholesale prices, the straightforward incentive would be to keep retail prices low to drive sales." *Id.*

### C.    The Scheme Enabled Pepsi to Increase Wholesale Prices

53.    At the wholesale level, Pepsi imposed series of significant price increases that were made possible by its Scheme with Walmart. In 2019, for instance, Pepsi imposed a market-wide wholesale price increase on all its customers – but exempted Walmart, thus fortifying Walmart's "price leadership" position while providing Pepsi further inflated wholesale profits on its remaining sales. As an internal Pepsi email acknowledged: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs/retails in order to drive growth on our mutual businesses."

54.    Pepsi followed this up with a series of substantial, successive wholesale price increases on all customers that would not have been possible absent the Scheme. Between 2022 and 2023, Pepsi raised wholesale prices by double-digit percentages each quarter for seven consecutive quarters. In October 2022, commentators observed that these "[p]rice hikes" had "pump[ed] up" Pepsi's profitability, as "PepsiCo's revenues have continuously beaten analysts' expectations quarter after quarter" thanks to its strategy of "pass[ing] on . . . costs to consumers."

55.    On a 2022 earnings call, Pepsi's Chief Financial Officer, Hugh Johnston, told investors that Pepsi's price increases were protected from competition, advising "We increased prices at the beginning of the fourth quarter . . . I actually think we're capable of taking whatever pricing [increases] we need." Pepsi's Chief Executive Officer, Ramon Laguarta, echoed this sentiment on a 2023 earnings call, stating: "[O]bviously, we've been able to raise prices and consumers stay within our brand."

56.    These price increases are not attributable to market conditions, including demand,

supply or costs. In fact, demand for soft drinks peaked in the early 2000s and has been in a prolonged slump, decreasing by more than 15% points from the peak. Meanwhile, the price of soft drinks has risen by over 70% since 2019:

## Average Soda Prices, 2020-2025

FinanceBuzz used government and retail data to track how the average price for different categories of soda changed year-over-year from 2020 to 2025.

| Soda Type | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Change |
|-----------|------|------|------|------|------|------|--------|
| 2-Liter Bottles | $1.94 | $2.04 | $2.09 | $2.64 | $2.89 | $3.14 | +$1.20 |
| 12-Pack Boxes | $5.18 | $5.77 | $6.90 | $8.15 | $8.93 | $9.79 | +$4.61 |

Sources: Websites and archived circulars for four major grocery retailers.



57.    Pepsi's wholesale price increases also cannot be explained by increased costs or general inflation. Commentators noted that Pepsi had "continually beaten analysis' expectations" by successfully increasing prices by more than costs during the pandemic. And inflation was only 3.2% in July 2023 and October 2023, but Pepsi increased prices by 15% and 11% in each month. Analysis of Consumer Price Index data reveals that the increase in prices is not the result of competitive market forces. For example, prices for a standard 2-liter bottle of soda rose at twice the rate of inflation or 62% versus an inflation rate of 25%. 12-pack boxes of soda increased even more drastically, rising 89% or three times the rate inflation, from 2020 to 2025:



58.    Prices of Pepsi cola have risen relative to Coca-Cola as a result of the scheme, as Pepsi has pursued aggressive price increases:



## V.    MARKET POWER AND RELEVANT MARKET

59.    The relevant product market consists of the market for bottled soft drinks. There are no reasonable substitutes for bottled soft drinks. Customers purchasing bottled soft drinks at retail do not view bottled soft drinks as reasonably interchangeable with other types of beverages, such as alcoholic drinks or non-bottled soft drinks. Alcoholic drinks have obvious mood-altering

effects that render them non-substitutable, while non-bottled beverages, such as fountain drinks, usually cannot be purchased at the same retail locations (e.g., supermarkets and convenience stores) as bottled drinks, and cannot be transported and stored for extended periods without spoiling. Nor are soft drinks substitutes for any non-beverage products for virtually any purpose.

60.     The relevant geographic market consists of the United States, and its territories, possessions, and the Commonwealth of Puerto Rico (in conjunction with the relevant product market above, the "Relevant Market").

61.     A hypothetical monopolist in the market for bottled soft drinks could profitably impose a small but significant non-transitory increase in price without causing a significant number of customers to switch to other products. The fact that Defendants were able to profitably inflate the prices of Pepsi Beverages shows that there are no sufficiently reasonable substitutes, and therefore that soft drinks are a relevant market.

62.     Pepsi has significant market power within the Relevant Market. It is the second largest manufacturer of carbonated soft drinks in the United States, controlling roughly a third of the market; along with the largest (Coca-Cola) and third largest (Dr. Pepper), the three account for over 90% of carbonated soft drink sales in the United States. There are significant barriers to entry in the bottled soft drink market, due to the incumbent firms' multibillion dollar investments in advertising and brand recognition as well as economies of scale through well-established distribution networks.

63.     Walmart has significant market power within the Relevant Market. Walmart is the world's largest company by revenue and operates over 4,700 stores in every U.S. state and nearly every U.S. Metropolitan Statistical Area. Roughly 90% of the U.S. population lives within ten miles of a Walmart. Walmart's dominance in the retail market makes it indispensable to its

suppliers and gives it significant buyer power in negotiations. Conversely, losing Walmart as a customer means losing a substantial number of retail customers entirely.

64.     Direct evidence establishes Defendants' combined market power in the Relevant Market. That direct evidence includes Defendants' ability to profitably and sustainably inflate prices above competitive levels. It also includes Pepsi's large price increases since January 2019 that were enabled by its agreement with Walmart that cannot be explained based on competitive forces.

## VI.    ANTICOMPETITIVE EFFECTS

65.     The Scheme caused Walmart's competitors, including Plaintiff and members of the proposed Class, to pay inflated wholesale prices for Pepsi Beverages, impairing their ability to compete effectively with Walmart in the retail market.

66.     Pursuant to the Scheme, Pepsi increased wholesale buyers' costs to acquire Pepsi Beverages through increased wholesale prices and reduced promotion payments. Pepsi increased prices for direct purchasers from Walmart as well.

67.     The Scheme enabled Pepsi to implement anticompetitive wholesale price increases that cannot be attributed to market conditions. The same is true of retail prices at Walmart.

## VII.    STATUTES OF LIMITATION DO NOT BAR PLAINTIFF'S CLAIM

### A.    Continuing Violation

68.     During the Relevant Time Period, Defendants' Scheme was a continuing violation in which Defendants repeatedly invaded Plaintiff's and Class Members' interests by taking overt acts in furtherance of the Scheme.

69.     Throughout the Relevant Time Period, Defendants discussed the Scheme, adjusted it to match new Walmart prices, agreed to new wholesale price increases, and repeatedly enforced their agreement against retailers who attempted to undercut Walmart's retail prices for Pepsi

Beverages.

70.      Throughout the Relevant Time Period, Defendants' Scheme repeatedly injured Plaintiff and proposed Class Members by causing them to pay overcharges each time they purchased Pepsi Beverages from Pepsi or Walmart.

**B.      Fraudulent Concealment**

71.      The statute of limitations is tolled because Defendants fraudulently concealed their Scheme.

72.      Plaintiff and members of the proposed Class did not have actual or constructive knowledge of the facts constituting their claim for relief and did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy.

**VIII.   CLASS ACTION ALLEGATIONS**

73.      Plaintiff brings this action on behalf of himself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representative of the proposed Class, which is defined as follows:

> All persons or entities that directly purchased Pepsi Beverages from Defendant Pepsi or Walmart within the United States from January 1, 2018 through the present and until the unlawful conduct alleged herein ceases. Excluded from the proposed Class are Defendants and all governmental entities.

74.      The proposed Class is so numerous that joinder of all members in this action is impracticable. On information and belief, there are hundreds, if not thousands, of members in the proposed Class.

75.      Plaintiff's claims are typical of those of the proposed Class because Plaintiff advances the same legal theories, and seeks to redress the same injury, for themselves as for all members of the proposed Class.

76.    Plaintiff and all members of the proposed Class were all injured by the same unlawful conduct, which resulted in all of them paying higher prices for Pepsi Beverages than they otherwise would have in a competitive market.

77.    Plaintiff will fairly and adequately protect and represent the interests of the proposed Class. Plaintiff's interests are not antagonistic to the proposed Class.

78.    Questions of law and fact common to the members of the proposed Class predominate over questions, if any, that may affect only individual members.

79.    Questions of law and fact common to the proposed Class include but are not limited to:

a.    Whether Defendants entered into the Scheme;

b.    The nature, scope, and extent of the Scheme;

c.    Whether, if Defendants entered into such a contract, combination, conspiracy, or common understanding, that conduct is a per se violation of Section 1 of the Sherman Act;

d.    Whether the Scheme, in the alternative, is unlawful under the rule of reason;

e.    Whether Defendants' conduct has in artificially raised prices of Pepsi Beverages purchased by members of the proposed Class; and

f.    the proper measure of damages for the proposed Class.

80.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

81.    Class action treatment is the superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

## IX.    CAUSES OF ACTION

### COUNT ONE

**Agreement in Restraint of Trade
in Violation of Section 1 of the Sherman Antitrust Act**

82.     Plaintiff incorporates each allegation above as if fully set forth herein.

83.     Defendants violated and continue to violate 15 U.S.C. §§ 1 and 3 by entering into, furthering, and enforcing an unreasonable restraint of trade. More specifically, Pepsi agreed with Walmart to fix, increase, inflate, or stabilize wholesale prices of Pepsi Beverages (the Scheme).

84.     Plaintiff seeks monetary relief on behalf of themselves and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

85.     Beginning in or around 2018, Defendants entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

86.     Defendants' conduct was undertaken with the intent, purpose, and effect of artificially increasing prices for Pepsi Beverages above competitive levels.

87.     Defendants perpetrated this Scheme with the specific intent of increasing prices for

Defendants' own benefit.

88.    Defendants' violations of Section 1 and 3 of the Sherman Act are per se illegal because Defendants are horizontal competitors who reached an agreement to fix wholesale prices of Pepsi Beverages for all direct purchasers from Pepsi and Walmart.

89.    Walmart competes directly with Pepsi in the market for soft drinks through its own private label brand of soft drinks, Great Value. Several of Walmart's Great Value offerings are near substitutes for Pepsi Beverages. For instance, Walmart sells Great Value Mountain Lightning, which is a citrus flavored soft drink similar to Pepsi's Mountain Dew. Walmart's Great Value Twist Up is a lemon-lime flavored soda akin to Pepsi's Starry.

90.    Therefore, the agreement between Pepsi and Walmart to fix and inflate the prices paid by direct purchasers of Pepsi Beverages from Pepsi or Walmart was a horizontal agreement between competitors.

91.    Defendants' conduct is also unlawful under the rule of reason.

92.    The market for soft drinks is a relevant market. Pepsi has market power in the relevant market.

93.    Pepsi's market power was enhanced by the Scheme, in that it is an agreement with the largest retail outlet in the United States, Walmart.

94.    Walmart has market power in the brick-and-mortar retail market.

95.    Walmart used its market power to cause Pepsi to agree to limit price competition from Pepsi's other direct purchasers.

96.    There is no pro-competitive justification for the Scheme. For example, Pepsi Beverages are not specialized products that require retailers to expend resources to explain their use to consumers or maintain a skilled sales staff that is familiar with their products.

97.     The Scheme violates the rule of reason under a quick look analysis because its anticompetitive effects are plain and obvious.

98.     The Scheme violates the full-blown rule of reason analysis because the agreement harms competition without providing any procompetitive benefits.

99.     Defendants' actions have caused Plaintiff and the proposed Class to suffer damages in the form of paying supracompetitive prices for Pepsi Beverages.

100.    As a direct and proximate result of Defendants' unlawful scheme, Plaintiff and the members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

101.    Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them and interest on those damages, together with reasonable attorney's fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

102.    Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

**PETITION FOR RELIEF**

103.    Plaintiff petitions for the following relief:

a.      a determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed as class representatives, and that Plaintiff's counsel be appointed as class counsel;

b.      a determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act;

c.      a judgment and order requiring the Defendants to pay damages to Plaintiff and members of the proposed Class, trebled;

d.      an order enjoining the Defendants from engaging in further unlawful conduct;

e.    an award of attorneys' fees and costs;

f.    an award of pre- and post-judgment interest on all amounts awarded; and

g.    such other and further relief as the Court deems just and equitable.

Dated: January 15, 2025                    Respectfully submitted,

*/s/ David D. Burnett*
David D. Burnett (NY Bar No. 4581641)
(SDNY Bar No. DB1024)
**SCHNEIDER WALLACE
COTTRELL KIM, LLP**
1050 30th Street NW
Washington, D.C. 20007
Telephone: (415) 421-7100
dburnett@schneiderwallace.com

Todd M. Schneider*
Matthew S. Weiler*
Raymond S. Levine*
Braden R. Leach*
**SCHNEIDER WALLACE
COTTRELL KIM, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com
rlevine@schneiderwallace.com
bleach@schneiderwallace.com

*Attorneys for Plaintiff William Davis, and the
Proposed Class*

* Pro Hac Vice Applications forthcoming